May it please the court, P. Joseph Sandoval for the petitioner Rosario Gambino. This case arises from a grant of deferral of removal under Article 3 of the Torture Convention in San Pedro, California with immigration judge Sid Graves. The Board of Immigration Appeals subsequently reversed that decision and the ensuing petition for review followed. Mr. Gambino is presently in custody in Oakdale, Louisiana. The stay of the application has been granted by this court over the opposition of the government and it will be hopefully that way until the mandate issues. This case, Your Honor. Mr. Gambino, just for clarification, has served his federal sentence? Yes, he did. So he's now under, he's now in custody of the INS, right? That's correct. He's no longer under the custody of the Bureau of Prisons. That's correct. And, Your Honors, I apologize. I'd like to reserve two minutes, if I may, for rebuttal. Whatever you have left in the clock. The Department of Homeland Security currently has him in custody in Oakdale, Louisiana. However, venue is proper in the Ninth Circuit Court of Appeals as the trial was decided in San Pedro, California. This case ultimately comes down to evidence presented and whether substantial evidence in the record compels a reversal of the Board of Immigration Appeals decision. And we believe that on this record it does. I'd like to take an opportunity to talk a little bit about the evidence that was submitted. Most importantly, the testimonial evidence that was submitted by various experts as well as recipient witnesses. First, as a foundation, Mr. Gambino has been alleged to be a member of organized crime for many years. That allegation is here in the United States as well as in Italy. And that allegation has been made by various members of the U.S. government as well as the Organized Crime Task Force here in the United States. I believe the FBI and also in Italy as well. But it would still have to be proven in Italy in a court of law, right? No, it would not. Under the 41 Bis regime and the 41 Bis rules, for anybody that's potentially associated with Mafiosa in Italy, they could be placed in the 41 Bis regime. They need not be convicted to be placed into that prison custody. They can be held for six months and then that can be renewed. So, Mr. Gambino. Renewed how? Pardon? Renewed how? Well, after a six-month period, the Ministry of Justice, who's in charge of determining whether an inmate should be placed in this special 41 Bis regime, could then review the case with the prosecutors or with the Italian task force and determine whether it is still justified to keep that person in the 41 Bis regime. So there are no judicial proceedings? After a judicial proceeding where somebody is actually convicted, then the Ministry of Justice can say that a prisoner must go into a 41 Bis regime. But there is no determination in the judicial system as to whether somebody should be placed in there. That is a decision by the Ministry of Justice. I'm sorry. I'm completely confused. The first question I asked you was, he does have to be found guilty or something. He said, no, he doesn't. He does not. And then he went on to explain he could be held for six months, he could be held for six months again. I asked you, is there judicial determination anywhere along the way? And you said, well, after he's found guilty, not. And so you sort of slipped that in. Like, when does that happen? Well, just to be clear, he doesn't need to be found guilty of any crimes. The fact that he was convicted in the United States for heroin trafficking and the fact that they believe that he may be a member of the Sicilian and Zerillo Mafia faction in Palermo, Italy, is enough for them to place him in 41 Bis custody. And hold him there forever without any judicial determination? Well, they could hold him there as long as he lives, certainly. They could hold him there for a few years. I didn't mean to hold his corpse. I didn't. Now, we had sent a. . . Do you understand you've given sort of conflicting answers? You said talk something about a determination of guilt, and then you. . . Now you're saying that you don't need a determination of guilt. Well, in order to get around that at the trial level, and I'd like to talk about what we found when we sent a former FBI agent to Italy. . . Get around what? That he does not need to be convicted in Italy. The Italian government has already told our investigator that if he goes to Italy, he will be placed in a 41 Bis facility. For how long? Pardon? For how long? They did not say. But he would be placed. He's a person of interest to the Italian government, and he would be placed there. Now, the respondents at trial in their closing arguments essentially conceded the fact that Mr. Gambino would be placed into a 41 Bis regime, and also with the Board of Immigration Appeals. So we believe that that issue has been dealt with through sending Mr. Parker over to Italy to talk to high-level government officials, to members of the Organized Crime Task Force there, and he came back with the answer unequivocally, yes, absolutely. He is a person of interest, and he would be placed into the 41 Bis regime. Assuming that he is placed in the 41 Bis regime, I was looking through the record to find where there was evidence that met the definition of severe pain or suffering, and there was a lot of information about what the BIA has referred to as deplorable conditions. But there was only, though, one individual who testified that there was actual torture other than isolated, discreet incidents. Could you help me understand what sorts of evidence there was in the record that would compel a conclusion that torture, as has been defined in the regulations, would more likely than not be visited on Mr. Gambino? Well, we had the testimony, and you're correct, of Daniel Lely, who is a noted mafia defense lawyer from Italy that came to the United States to testify. And he testified based upon his eyewitness experience and the discussions that he had with his own clients that are in the 41 Bis regime. And in the immigration proceedings, hearsay is admissible, so he testified. There's no doubt that that's admissible, and that would be evidence supporting a determination that there was torture. But the other witnesses were saying, no, Italy doesn't have torture. There are isolated, discreet incidents. There was one 10 years ago. And so I was looking for more in order to find something that would compel a conclusion. Okay. Well, we brought Eckhard Mueller apart, former director at the European Council, which is in charge of the European Court of Human Rights. And he did testify about cases that were in front of the European Court of Human Rights where there were violations of the torture convention. And he discussed at length cases where the European Court has determined that although the 41 Bis prison regime is not unconstitutional per se, but as applied to certain particular inmates, it may cause cruelly human-integrated treatment. So I think that Eckhard Mueller repared made that connection. He put that link in the chain that we needed, that the European Court of Human Rights to some extent has already addressed this. Now, Professor Bassioni, who was acknowledged as an expert in the torture convention, in Italian criminal prison systems, and also on the international human rights, had testified again. And we're going to concede that he said Italy as a country doesn't torture. But he said there are situations where the 41 Bis regime has devolved into a situation where there is repeated coercive interrogations that are taking place in order to get people to become penitentes, repentant, and testify against other mafia members. And that is a violation. through lack of access to medical care, lack of access to family, and that the prison officials were taking advantage of some of these deplorable conditions in order to convince people to cooperate. Does that rise to the level of what the definition of torture is, though? That was my concern, that that seemed more pressure as opposed to this severe pain or suffering as defined. Well, we think it does. And especially when you look at Mr. Gambino and his particular vulnerabilities and his particular frailties. And Dr. Grossian, who testified on faculty at Harvard Medical School and an expert on solitary confinement, said that with respect to Mr. Gambino, having reviewed all of his medical records from the Bureau of Prisons and from the Department of Homeland Security, that placing Mr. Gambino in a 41 Bis prison regime and understanding that there is a coercive type of interrogation that takes place that is outside the punishment that is being meted out against these people would be life-threatening and life-shortening. And then Mr. Bassioni had also testified that the Italian system is not providing its inmates in the 41 Bis prison regime with proper medical care and that on this record and with respect to Mr. Gambino's particular vulnerabilities and frailties, it could be life-threatening and potentially life-shortening as well. Let me ask you a question on a somewhat different subject. If he gets deported, he will get deported to Italy. Is he not given a choice to be deported to another country if that country will accept him? Well, that's an excellent question. I'm running out of time, but I'd like to answer that. The Department of Homeland Security can only deport Mr. Gambino to where the judge has issued an order, and that is Italy, because at the time that we presented the case at trial, we did not have a third country that would accept Mr. Gambino. So even in the event that we were to get a third country right now, we would still have to reopen the case before the Board of Immigration Appeals, have it remanded back down to the immigration judge so that she could order an alternate order of deportation to the third country that we find. Mr. Gambino did not petition for a third country at the time. Pardon? Did not seek deportation to a different country at the time he was before the immigration judge. And that's because he had no rights and no ability and no evidence to prove that a third country would take him. Well, he's a citizen of Italy, right? Yes, he is. Isn't he allowed to live anywhere in the European Union by virtue of his Italian citizenship? With his conviction, my understanding is no. He just can't freely move with a serious drug conviction like that. So we don't have a third country, to my knowledge at this point, that would accept him. We certainly didn't have one when we went to trial, and there's no way for the immigration judge to order him deported to any other country unless he actually has a travel document issued in his name by a foreign government allowing him to travel to that third country. And we don't have that at this point. Okay, we'll hear from the government. Thank you. Good morning. My name is Jesse Blesser. I represent the Attorney General of the United States. This case arises from a board's decision not to defer a petition of removal. The board made a judgment that the evidence did not show a clear probability that the petitioner would be tortured upon his removal to his native country, Italy. The record evidence does not compel a contrary conclusion. There's certainly a lot of evidence in the record suggesting that the prison officials are taking advantage of substandard conditions in the prison to try to extract information. There was a number of witnesses who testified to that. That certainly seems to fulfill the specific intent requirement under the definition of torture. Why doesn't that meet the torture requirement? First, they were qualified. This always happens. It was in isolated cases, as you mentioned earlier. Professor Bassioni, that's what he said, in some cases, and this could happen, and in some instances, this has occurred. So on the first hand, there's a more likely than not requirement, and there's no specific evidence that they intend to question Mr. Gambino. Now, he may be in prison, and that's not a dispute, but there's no evidence that someone out there wants to specifically seek information from him. Well, there was some testimony that the whole purpose of the prisons, which although originally to isolate the criminals from directing their crime enterprises outside of the prison, has now turned into another purpose, which is to try to get additional information, and that the officials are consciously or intentionally using the conditions of the prison for that end, as opposed to the descriptions of discrete incidents of beatings or torture of individual prisoners. And in cases where that has happened, those rogue officials have been dealt with by the Italian government. The Italian government has not breached its legal duty to intervene and stop these instances. Professor Bassioni testified about an incident that was 20 years ago, and the Italian government struck hard. There's been allegations made in the International Constitutional Court of Human Rights in Italy and in Europe, and every time the evidence suggests that Italy regards adverse decisions very seriously. It also allows international oversight by a number of organizations, and as Professor Bassioni explained, since these instances have become knowledge and become aware by the government, they've tightened the inspection rules, and they've actually appointed an ombudsman to go around and inspect these prisons and to inhibit and prevent these isolated incidents from occurring. And so when you look at, yes, there have been isolated incidents, much like in almost every country in the world, where rogue officials have acted outside their duty, it's the response. It's how the government, once they have awareness, reacts. And in this case, the evidence shows that the Italian government has not breached its legal duty to intervene and prevent further action. But putting the isolated incidents to the side and looking at whether the purpose of the institution is to extract information, which is what some of the witnesses, including Professor Bassioni, testified to, what's your response to that? Why doesn't that meet the definition of torture? Mr. Sandoval suggests that the bad medical conditions, the other types of difficult conditions, the solitary confinement, all can rise to the level of torture if being used for a prescribed purpose. Well, the 41B's Prison Administration Act was not designed for the purpose of inflicting torture. It was designed for public security and safety grounds. And in claims brought by prisoners, the international constitutional, I mean, the Italian constitutional court has said it must be based on public security and safety grounds and cannot amount to inhuman treatment. That's a direct quote from a case, from the Messina case that's in the brief. So it cannot. And so they've specifically said that this cannot amount to torture. And the reaction or the actions that the Italian government is taking to ensure that by suggesting that the grounds in which you continually detain someone have to be renewed in a due process given to prisoners who suggest or claim that I shouldn't be in this administration, I shouldn't be subject to 41B's, allows them to contest that all the way up through the court system in the European Union. And so the evidence, Professor Passioni testified about a number of things. On the one hand, he said Italy unequivocally does not design any system to inflict torture. But he said in some instances, these officials have taken steps out of their bounds. And, again, I submit that the record suggests that when done, that the Italian government strikes very hard to prevent further actions by these prison officials. And, again, allows due process by the prisoners and allows international oversight. Talk to me about this due process. Mr. Sandoval, I wasn't sure I understood this question entirely, but he seems to say that Mr. Is there a judicial determination along the way or a judicial view of the decision somewhere down the road? Yes. Much like in our prison system, he can be detained and subject to 41B's immediately. But he does have an opportunity within 10 days to go before, and, again, I want to look to make sure I have it correct. It's on page 7 when I detail the respondent's brief. He has to go before a minister of justice who can then make a determination based on his claim for why he should not be there. And then the decision, this is what the Italian constitutional court said, that decisions to extend application of the regime subsequent to that initial determination have to be based on sufficient grounds which were independent of those which had to be, that there's a review process along the way, and that if you continue to detain someone after the initial period, that it has to be independent of the reasons you detained him in the first place for maybe the dependency of a trial, maybe a conviction, but they have to be independent of those, and they have to be based on public security and safety grounds. And so there's a review process along the step of the way. There's no, it's not that these people are subject, placed in a prison to, you know, forever, and they just sit there, and then they're stuck there. There's a very strong review. And the evidence itself reflects that, because what we have here is a number of cases from European courts that have handled complaints by prisoners, and we have the Italian government reacting to that, and the evidence reflects that, you know, the international oversight, and Professor Bassioni said that, and so did Dr. Rippard. He said that the government had made sure that, you know, in light of some of these complaints, that they've allowed, they've, I guess, adjusted the rules to provide for further recreation. And that's what he was dealing with, the type of, you know, the medical complaints. He said, you know, they've now allowed more recreation time, and they've kind of dealt with some of the complaints. And so what we have here is we have a civilized country that has a very developed prison system, and has been a signatory to Article III of the Convention since its inception, that has dealt with its responsibility to ensure that it doesn't breach its duty to prevent torture. But there's certainly a lot of evidence in the record that the conditions in the prisons are substandard, and that they don't have the money. I mean, there doesn't seem to be a lot of dispute about that. So the question is whether those conditions can amount to torture if being used for a prescribed purpose. Can you address that? I'd like to analyze that under the Villegas case that this Court issued recently, where it dealt with the rock-bottom conditions in Mexico. And we had a petitioner in that case who knew he was going into medical issues, knew he was going into a facility where people had been tied to beds, had limbs cut off when they had suffered severe, you know, type of maladies or problems. And so we had a very, very terrible situation, in that people had been subject to substandard treatment. The question in that case was that the pain and suffering caused by those people was an unfortunate but unintended consequence of their detention. But what if it was intended? I mean, that's the difference in this case, that the question that arises is whether Italy, in fact, intends these conditions or uses these conditions for a prescribed purpose. Our decision, Villegas, we decided it wasn't being inflicted intentionally. Again, the record in the Boards did not suggest that Italy had prescribed this type of regime to inflict torture. And it had not turned into a situation where it had done so, because if it had, the courts that have reviewed the system and held it compatible with the Constitution and compatible with Article III would have struck it down. So we, you know, the courts have reviewed, the International Court has reviewed the system, and so has the Italian Constitutional Court, and they've held that it's compatible with the Constitution, meaning that it does not amount to torture, and there's no specific intent to torture. And so that would be, you know, that's the response, is that, you know, this is, although there have been, there's some evidence in the record that tugs in that direction, there's unequivocal evidence that this court, that the regime has been subject to review and upheld on numerous occasions. And, again, that's under Italy's law, which prohibits torture. And so, just to further clarify my point, if the regime had changed its purpose from public security and safety grounds to one in which it intended to torture inmates, then the Italian Constitutional Court, the European Court for Human Rights would have struck it down. But, no, it has upheld that regime. Okay. Thank you. Thank you. Your Honor, if you'd like a minute for rebuttal, you may take it. Mr. Sandoval. First, I'd like to say that Villegas is not on point. And, Your Honor, you're absolutely correct, that in Villegas we had substandard conditions in a Mexican jail that were just unfortunately due to situations that were beyond, beyond the control of the prison officials. However, in the Italian system, we see that something is different. It's intended. What do you do with those rulings of the Italian Constitutional Court and the European Court of Human Rights that seem to say the opposite? Well, again, what we're looking at is rulings that are saying 41 bis is not per se unconstitutional, as it is written. But that's different from saying that the application of 41 bis to certain prisoners is a violation of Article III. So, you know, as written, it might be fine, but it depends upon the application. And we saw just recently, just two days ago, when Dick Cheney was talking about a situation in Guantanamo where they're saying we were using all of these methods that were authorized. However, in this particular case, it may have gone beyond the limits. You're trying to distinguish Villegas, and you're trying to distinguish, saying, well, this is being used for one of the purposes. But it's not the Italian government. If the Italian government were using it for that purpose, they wouldn't have those rulings saying the system is fine. The fact that occasionally some officials do it. Well, the fact that occasionally somebody is tortured is not fine as it relates to the person that's being tortured. Professor Bassioni addressed this, and he said, the practice, and I'm quoting from 589 in the administrative record, the practice became to enhance interrogation of persons who were placed in these facilities. He goes further to say in 590, as a result of the very specialized condition of the detention, a number of other consequences have emerged over the years which the Italian prison authorities and the general public have noted. Well, what you have to show is that the record compels a finding that your client will be tortured. That's what it requires, that, you know, your client, if taken there, will be subjected to torture. And not only does it have to be a record to support this, it has to be a record that compels this. And it seems to me you haven't come close to that. Well, I think that we have when you look at what Dr. Grassian said after a review of all the medical records, when you look at Tom Parker, and he indicated that, yes, absolutely, this person is going to be put into the 41-bis regime. When you look at the statements of Professor Bassioni, that says essentially that 41-bis has devolved into a situation where they're having interrogations that are not part of the punishment, part of the reason you're in jail, but it's for another reason, it's for a purpose of getting information about either the person interrogated or a third person. This guy left Italy in 1966 when more than half the people in this courtroom weren't even born. You think they're going to try to torture him to get information out of him as to his conditions in Italy? It's a little hard to believe. Well, I would say absolutely. And as we discussed in the record, there's a... 42 years ago? Well, it wasn't 42 years ago that Tom Parker went to Italy. It was two years ago that Tom Parker went to Italy, and he talked to people that were responsible for the 41-bis regime. And he said we're going to torture this guy? They didn't say we're absolutely going to torture this guy, and unfortunately we don't have declarations or interrogatories or affidavits to that effect, and we could never get that, but what they did say is we're interested in him, and we will place him in the 41-bis regime when he gets here. And at the trial itself, there's an FBI officer in San Pedro that may or may not be cooperating with the Italian government, watching the entire proceedings, taking notes during the entire proceedings. Mr. Gambino has been in jail since 1984, but apparently the FBI is still interested enough to send an FBI agent down to San Pedro to sit into the proceedings and to assist the government counsel. So I would say that the U.S. government is certainly still interested in him. Thank you. And so would the Italian government. Okay. These are your statements. We will take a short recess.
judges: Kozinski, Fisher, Ikuta